IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Tina Dodd, ) | |
| ) | Civil Action No. 6:04-0469-HFF-WMC |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| City of Greenville, Chief Willie ) | |
| Johnson, Detective Bobby Carias, ) | |
| Detective Craig Gardner, and ) | |
| Captain Willie Harper, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the court on the motion of defendants City of Greenville, Chief Willie Johnson, and Captain Willie Harper ("the moving defendants") for summary judgment[1] pursuant to Federal Rule of Civil Procedure 56. By separate report filed this date, this court recommended that the motions for summary judgment of defendants Carias and Gardner be granted.

In her original complaint, the plaintiff alleged causes of action for gender discrimination under Title 42, United States Code, Section 1983, violation of her First Amendment rights, outrage, breach of contract, and breach accompanied by fraud.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

---

[1]The motions were fully briefed in early March; however, the motions were referred to this court on May 26, 2006.

In response to the motion for summary judgment, the plaintiff stated that the outrage claim is asserted against defendants Carias and Gardner only. Accordingly, the court will consider the moving defendants' motion with regard to the remaining claims.

**FACTS PRESENTED**

The plaintiff, who is a female, has been employed by the defendant City of Greenville as a police officer since 1996. In 1999, she was promoted to Detective in the Vice and Narcotics Division (pl. dep. vol. 1 at p. 16). Her supervisors in the Vice and Narcotics Division were Sergeant Mike Gambrell and Lieutenant Otho McLauchlin. *Id.* After approximately two and a half years, she was promoted to her current position as an Intelligence Officer in the narcotics unit where she is supervised by Lieutenant Randall Evett and Sergeant Scott Willis. *Id.* at pp. 14-15. Defendants Carias and Gardner are also police officers. Defendant Johnson is Chief of Police for the City of Greenville, and defendant Harper is a Captain in the police department.

The plaintiff alleges that since 1996 City of Greenville police officers have "intentionally held down the transmitter buttons on their walkie-talkies so as to make the plaintiff unable to transmit over her walkie-talkie" (comp. ¶ 6). Carias admits to participating with regard to another officer, but claims he never did it to the plaintiff (Carias dep. at pp. 8-9). The plaintiff testified in her deposition as to an incident that occurred while she was on a domestic violence call when she was unable to transmit to the officer that was backing her up or to the dispatcher because an officer or officers were intentionally holding down the transmitter buttons on their walkie-talkies (pl. dep. vol. 1 at pp. 38-45). The plaintiff testified that she reported the problem to Sergeant Tarkenton and met with Captain Harper to discuss it as well. According to the plaintiff, Sergeant Tarkenton acknowledged that she was being "walked on," but did nothing to address the problem, and Captain Harper told her that they could not figure out who was holding down the transmitter. The plaintiff

2

acknowledged that Lieutenant Bill Robinson addressed the problem in roll call several times. However, she testified that she did not believe anything was done to address the situation because she never received anything in writing. *Id.* at pp. 42-43.

The defendants' records show that the plaintiff filed an allegation of employee misconduct on July 17, 1999, reporting that she was being harassed via the radio transmission problems and describing the blocked radio transmissions on the evening of the domestic violence call (*see* Johnson aff., ex. A). In response, Lieutenant Bill Robinson submitted a report to Captain Harper regarding the plaintiff's complaint and indicating that he spoke with all of the officers about the problem. He stated that "several officers' names were given as suspects…but no proof was found." *Id.* In addition, in a memorandum to then Major Johnson dated November 10, 1999, Captain Harper described the complaint and indicated that he spoke to Sergeant Tarkenton who met individually with each officer and was unable to determine who was responsible for the infractions. *Id.* Captain Harper stated, "barring a witness or confession, it is virtually impossible to determine who is causing the problems without the new technology now available, in which the department has an order." *Id.* The plaintiff was notified of the results of the investigation by memorandum dated December 6, 1999 (Johnson aff., ex. B). Significantly, Chief Johnson notes in his affidavit that, over the years, other officers – both black and white, male and female – complained informally about the radio transmission problems (Johnson aff. ¶ 5). Chief Johnson also indicated that the department now uses technology that can trace who is transmitting, or holding the transmitter button down to "walk on" other transmissions. *Id.*

Following the July 17, 1999, radio transmission problems, the plaintiff spoke to her supervisors about transferring to Vice because she no longer felt safe working as a uniformed officer (pl. dep. vol. 1 at pp. 45-48). Although the plaintiff stated that she applied for the position in June of 1998, no reason was given to her for the 1999 transfer except

that she was experiencing the radio problems. *Id.* at pp. 48-49. Other individuals had put in for the transfer, and were upset when plaintiff got it instead. *Id.* at pp. 61-62.

In February 2000, the plaintiff found an audiotape in her desk after returning from 60 days of cross training. The plaintiff alleges that the speaker in the tape made threats against her and her son. There does not appear to be any allegation or evidence that any of the individual defendants were involved in this incident. A transcript of the audiotape reveals that the speaker made racial slurs and threats and at one point referred to "bastards" (Johnson aff., ex. D). Because the plaintiff was the only black female within her unit and the only female in her unit with a child and her desk was in a code protected area, she believed the tape was directed at her (pl. dep. vol. 1 at pp. 94-97). The plaintiff notified Sergeant Gambrell, and she met with Major Johnson and Captain Harper regarding the tape. According to the plaintiff, the defendants thought it was merely a sick joke. She filed an Allegation of Employee Misconduct on or about March 1, 2000, and she requested an investigation and was told one would be conducted (pl. dep. vol. 1 at pp. 97-101; Harper aff. ¶ 5; Harper dep. at pp. 6-10). The tape was sent to the FBI and SLED for examination, but the results were inconclusive (*see* Johnson aff. ¶ 8, ex. E, F; *see also* Harper aff. ¶ 6). In the letter to the FBI requesting analysis of the tape, Captain Harper stated that an internal investigation had yielded no helpful information in determining who made the tape and who left it on the plaintiff's desk (Johnson aff., ex. E). The plaintiff believed the investigation was insufficient and claims she was not informed of the results of the investigation until after a newspaper article about the incident was published (pl. dep. vol. 1 at pp. 97-102, 108-11). According to the plaintiff, out of fear because of the tape, she sent her son to California to live with her sister (pl. resp. m.s.j. 2).

Shortly after midnight on June 5, 2003, the plaintiff received a call on her cellular telephone at her residence. The plaintiff answered, and the speaker, who was later identified as defendant Carias, said, "Is this Tina Dodd?" The plaintiff said, "May I ask

who's calling?" Carias responded, "You bitch, I hate you, I'm going to get you, watch out," before disconnecting. He then called back, saying such things as "I'm going to get you, I hate you, bitch, you lazy bitch, watch out I'm going to get you" before the plaintiff disconnected the call. Around 3:00 a.m., the plaintiff received a third telephone call with someone breathing heavily into the telephone. The plaintiff turned off her telephone to prevent further calls. According to the plaintiff, defendant Carias in making the calls used defendant Gardner's cellular telephone, with Gardner's consent (comp. ¶¶ 8-10). Defendant Gardner testified that he dialed the plaintiff's telephone number at the urging of other officers, but the call was dropped before he heard the plaintiff answer. Later, he noticed that a call had been made back to his telephone, and he redialed the last number called. When the plaintiff answered, he hung up. Gardner testified that he could tell by the plaintiff's tone that she was "not happy" (Gardner dep. at pp. 9-10). Defendants Carias and Gardner were off duty in Columbia, South Carolina, attending training at the South Carolina Law Enforcement Academy at the time the calls were made (Gardner dep. at pp. 19-20).

    The plaintiff reported the telephone calls to defendant Captain Willie Harper. Chief Johnson requested that she not file a criminal incident report and allow the matter to proceed as an internal investigation. He later called the plaintiff to insure that she pursued the internal affairs course of action and did not file an incident report. *Id.* at pp. 137-39. According to Chief Johnson, he was concerned that communication of the criminal incident report would impede their internal investigation (Johnson aff. ¶ 12). The plaintiff claims that when the defendants failed to advise her of their investigation and whether any disciplinary action would be forthcoming, she filed her a criminal incident report on July 16, 2003 (pl. dep. vol. 1 at p. 140). After the internal investigation, defendants Gardner and Carias received suspensions without pay for three days and five days, respectively (Harper dep. at p. 15). The plaintiff was notified of the results of the investigation by memorandum dated November 25, 2003 (Harper aff. ¶ 8; Johnson aff. ¶11, ex. I). Chief Johnson asked

5

Solicitor Robert Ariail to review the facts of the investigation to determine if criminal prosecution of Gardner and Carias was appropriate. The Solicitor responded that the facts contained in the report did not establish any significant criminal behavior and did not warrant prosecution. He recommended that the matter be resolved internally (Johnson aff. ¶ 12, ex. K, L).

The plaintiff claims that the acts of defendants Carias and Gardner were outrageous, and she suffered "severe and extreme emotional distress, public humiliation, and embarrassment" as a result of these defendants' actions (comp. ¶¶ 27, 29). The plaintiff claims that she visited her family doctor about her inability to sleep, and she talked to relatives and friends. She was prescribed sleeping pills, but she did not take them, and her weight fluctuated (Carias m.s.j., ex. C, pl. dep. at pp. 56-60). In her deposition, the plaintiff testified that her insomnia and weight fluctuation occurred from 1999 to 2001, several years prior to the telephone calls involving these defendants. *Id.*

During her employment with the Greenville Police Department, the plaintiff claims that she requested several lateral transfers, which she was denied. Specifically, the plaintiff asserts that she requested transfers from Vice to Burglary, Auto Theft, ATF Task Force, and Community Patrol (pl. dep. vol. 1 at pp. 17-19; pl. dep. vol. 2 at pp. 20-22 and 37-38). The plaintiff stated that the Burglary positions ended up going to Bobby Carias, Patrick Allgood, and Drew Palmer. She testified that Drew Palmer had seniority over all of the applicants, Allgood had been with the department longer than she had (although he had not been in Vice as long), and Carias had been with the department for about a year less than the plaintiff but had served in Vice for the same amount of time (pl. dep. vol. 1 at pp. 35-36). According to the plaintiff, when she inquired of Captain Henderson as to why she did not get the transfer, he told her that she was an asset and needed to be in Vice because they needed black females in Vice and Narcotics. *Id.* at pp. 18-19. The plaintiff could not identify who was transferred to the Community Patrol position, nor did she

6

indicate who received the Auto Theft transfer. *Id.* at p. 34. She stated that Detective Jason Rampey got the ATF Task Force position. Detective Rampey had been with the department "a year or so more" than the plaintiff, but he had not been in her particular unit as long. *Id.*

In addition, the plaintiff testified that when the Intelligence Officer position became open, the opening was first announced to her unit and she was the only person in her unit to apply. Following her request for the transfer, however, a memorandum was published within the detective division soliciting additional applicants. According to the plaintiff, the publishing of a memorandum as such was atypical when filling an Intelligence Officer position – that it was generally filled by someone from her unit. *Id.* at pp. 21-22. The plaintiff claims she was again informed that she was the only applicant. *Id.* The plaintiff confronted Chief Johnson about why she was not awarded the position prior to the issuance of the memorandum and, according to the plaintiff, Chief Johnson indicated that there was a "trust factor." Chief Johnson told the plaintiff that he needs to have faith and confidence in his Intelligence Officer and know that when he tells them to do something, they will do it. He indicated that the trust factor with the plaintiff stemmed from the plaintiff's filing of an incident report pertaining to Carias' and Gardner's misconduct after he requested that she not to do so because the incident was being investigated internally. *Id.* at pp. 23-24. She claims she later learned that Gardner had also applied for the position of Intelligence Officer. The plaintiff was given the position, but she claims that this was only because Gardner removed his name and told Captain Henderson to give the job to the plaintiff. *Id.* at pp. 25-26. Defendant Gardner testified that he did not withdraw his application so that plaintiff could have the job but, rather, he was concerned that the hours would prevent him from continuing to coach youth sporting events in the evenings. He also had aspirations of working a different position in Intelligence and did not want to accept the job and then leave if the opportunity to transfer presented itself (Gardner dep. at pp. 20-21).

Gardner testified in his deposition that he had been "led to believe" that he would get the job prior to withdrawing his application. *Id.*

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's

position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

### *Section 1983 Claim*

In her complaint, the plaintiff alleged a cause of action for gender discrimination under Section 1983. She alleged that she was subjected to heightened scrutiny and was subjected to reprimands and disciplinary actions because of her sex. She further claimed that she has been denied transfers, promotions, and salary increases as a result of the discrimination (comp. ¶¶ 21-22).

In her response to the defendants' motion for summary judgment, the plaintiff's only argument in support of her Section 1983 gender discrimination claim (pl. resp. m.s.j. 3-5) is that defendants Johnson and Harper "set the policy for the department

9

in terms of allowing widespread abuses to become customs." The plaintiff contends that the "let boys be boys" attitude "and lack of punitive consequences for violations established a policy that allowed the harassment and hazing of unpopular officers outside the click of male officers" (pl. resp. m.s.j. 5). The plaintiff relies on three incidents and the defendants' response to those incidents in support of her sex discrimination claim: (1) officers intentionally holding down the transmitter buttons on their walkie-talkies so as to make the plaintiff unable to transmit over her walkie-talkie; (2) the tape containing racial slurs and threats found in her desk on February 23, 2000; and (3) the threatening telephone calls received from coworkers Carias and Gardner on June 5, 2003.

> The equal protection clause confers a right to be free from gender discrimination that is not substantially related to important governmental objectives. Applying this precept, courts have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983. Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983.

*Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (internal citations omitted).

In this case, the plaintiff is alleging that defendants Johnson, Harper, and the City of Greenville are liable under Section 1983 for the above-described incidents that violated her constitutional rights. The doctrine of *respondeat superior* generally is inapplicable to Section 1983 suits. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928-29 (4th Cir. 1977). The plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's

constitutional injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994).

The City of Greenville also argues that it is entitled to municipal immunity from liability under Section 1983. Under Section 1983, liability of a governmental body arises only when execution of a government's policy or custom inflicts a constitutional injury. *Proffit v. District of Columbia*, 790 F.Supp. 304 (D.D.C. 1991). Three conditions must be satisfied before liability attaches:

> (1) only acts which the government has officially sanctioned may give rise to liability;
>
> (2) only those officials who have final policymaking authority may, by their actions, subject the government to liability; and
>
> (3) the challenged action must have been taken pursuant to a policy adopted by the officials responsible under state law for making policy in that area of the government's business.

*Id.* at 309.

In *Monell*, 436 U.S. 658, female employees of the Department of Social Services and the Board of Education of the City of New York brought an action challenging the policies of those bodies in requiring pregnant employees to take unpaid leaves of absence before those leaves were required for medical reasons. The Court held that official policy must be "the moving force of the constitutional violation" in order to establish the liability of a government body under Section 1983. *Id.* at 694.

Local governments may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels. *Id.* at 690–91. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983. *Id.* Municipal custom

will arise where a course of conduct, though not formally approved through official channels, is so permanent and well settled as to virtually constitute law. *Id.* A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law. *Monell*, 436 U.S. at 690.

The plaintiff argues generally regarding a "let boys be boys" attitude, "lack of punitive consequences for violations," and a "policy that allowed the harassment and hazing of unpopular officers outside the click [sic] of male officers" (pl. resp. m.s.j. 5). However, she has failed to set forth evidence supporting her arguments. With regard to the first incident, the evidence shows that the plaintiff's complaint was investigated, but the findings did not prove or disprove who was involved in the improper radio traffic. In response to the plaintiff's request after the incident at issue, she was transferred out of the patrol division in 1999. Further, in September 2000, the City purchased new radio equipment that can trace who is transmitting or holding the button down to "walk on" other transmissions. Importantly, Chief Johnson testified in his affidavit that, over the years, other officers – both black and white, male and female – complained informally about the radio transmission problems (Johnson aff. ¶ 5).

With regard to the second incident, the plaintiff contends that defendants Johnson and Harper treated the tape that the plaintiff found in her desk as a joke. Specifically, she argues: "Again, the defendants failed to take any corrective action, to condemn such conduct, or to seek assistance from the Department as a whole, or simply to make known their intent not to tolerate such behavior and to do their utmost to bring the

12

perpetrators to account" (pl. resp. m.s.j. 4). However, the evidence shows that neither an internal investigation nor consultation with both SLED and the FBI yielded any evidence to help identify the person who made the tape or the person who left the tape in the plaintiff's desk.

With regard to the threatening telephone calls placed by defendants Carias and Gardner, the plaintiff contends that the City tolerated or condoned horseplay and allowed "widespread abuses to become customs" (pl. resp. m.s.j. 4). The plaintiff has submitted no evidence to support her allegation of any widespread abuses. The plaintiff refers only to defendant Carias' admission in his October 2005 deposition that he made a prank call to 911 dispatch while he was on duty, for which he received a verbal reprimand (Carias dep. pp. 24-25). The evidence before the court shows that an investigation was done when the plaintiff complained regarding the telephone calls, after which defendants Gardner and Carias received suspensions without pay for three days and five days, respectively. Also, Chief Johnson asked Solicitor Ariail to review the facts of the investigation to determine if criminal prosecution of Gardner and Carias was appropriate. Importantly, the plaintiff has come forward with absolutely no evidence that the incidents at issue, or the defendants' responses thereto, were based upon her gender. The evidence fails to show that the responses of defendants Johnson and Harper to the incidents were "so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct." Further, the plaintiff has failed to establish a practice or custom of the City of Greenville that allowed the practices that she alleges were used to discriminate against her.

Based upon the foregoing, the plaintiff's claims alleging that the defendants violated her constitutional rights by establishing a policy allowing the harassment of "unpopular officers outside the click [sic] of male officers" fail.

In the "Factual Allegations" contained in the plaintiff's response to the defendants' motion for summary judgment, the plaintiff addressed only the above-discussed three incidents and did not mention any facts with regard to her claims of disparate treatment as to transfers, promotions, pay, and discipline. Further, the plaintiff has not responded to the defendants' well-supported arguments in support of summary judgment on these claims (def. m.s.j. 19-24). The plaintiff appears to have abandoned any claims with regard to these allegations. As the plaintiff has not set forth specific facts showing that there is a genuine issue for trial on the claims of gender discrimination with regard to employment opportunities and discipline, summary judgment should be granted as to those claims.

***Freedom of Speech***

In her complaint, the plaintiff alleges that the moving defendants punished her "for exercising her First Amendment right to freedom of speech" (comp. ¶ 24). To prevail on this cause of action, the plaintiff must show (1) that she engaged in protected expression regarding a matter of public concern; (2) that her interest in First Amendment expression outweighs her employer's interests in efficient operation of the workplace; (3) that she was deprived of some valuable benefit; and (4) that a causal relationship exists between her protected expression on matters of public concern and the loss of the benefit. *Peters v. Jenney*, 327 F.3d 307, 322-23 (4th Cir. 2003). The plaintiff must show that the protected speech was a motivating factor or played a substantial role in inducing the adverse action.

The plaintiff contends that defendant Johnson forbade her from filing a criminal incident report pertaining to the telephone calls made by defendants Carias and Gardner on June 5, 2003 (pl. resp. m.s.j. 5). However, in her deposition, the plaintiff testified that Chief Johnson wanted to make sure they had an "understanding" that the

investigation would be internal. The plaintiff told him that if the internal investigation was not done in the time and manner that she wanted, she would file a criminal incident report, which she did on July 16, 2003, because she had not heard results of the internal investigation by that time (pl. dep. vol. 1 at pp. 137-40). There does not appear to have been any testimony that Chief Johnson "forbade" the plaintiff from filing a criminal incident report, but only that he asked her not to file a report while the internal investigation was ongoing.

The plaintiff further contends that she was retaliated against when defendant Johnson refused to give her the Intelligence Officer position (pl. resp. m.s.j. 5; pl. dep. vol. 2 at pp. 69-71). Chief Johnson commenced an internal investigation after learning of the telephone calls and believed that the plaintiff's filing of an incident report at that time could compromise the internal investigation (Johnson aff. ¶ 12). After filing the incident report, the plaintiff applied for the position of Intelligence Officer in August 2003. According to Chief Johnson, because of the plaintiff's conduct in filing the report after he had requested that she wait, he was initially reluctant to offer her the job. He explained that the position demanded a level of trust and a willingness to follow his instructions, and he questioned whether the plaintiff was capable of those requirements. Ultimately, Chief Johnson was satisfied with her trustworthiness and offered the plaintiff the position, which position she continues to hold (Johnson aff. ¶ 13). The plaintiff's argument that the defendants "retaliated by refusing to give her the Intelligence Officer position" (pl. resp. m.s.j. 5) is in direct contradiction to the facts as the plaintiff *was* awarded the position and, indeed, she still holds the position. The plaintiff has cited no authority for the proposition that a delay – while defendant Johnson evaluated the plaintiff's ability to fulfill the requirements of the position – constitutes deprivation of a valuable benefit. Accordingly, the plaintiff cannot meet the third element of a *prima facie* case.

***Breach of Contract***

The plaintiff alleges that the defendant City of Greenville "failed to abide by its promises and representations to the plaintiff [in the defendant's handbook] in that the defendant denied the plaintiff transfer based not on her qualifications but in reaction to her filing a complaint of misconduct" (comp. ¶ 32). The plaintiff argues in her memorandum in opposition to summary judgment, "The question is, whether the employer 'reasonably' determined it had cause to terminate, or did discrimination take part? That question is one uniquely for a jury" (pl. resp. m.s.j. 7). It is unclear exactly what the plaintiff means by this statement as she is currently an employee of the City, and she has never been terminated. The plaintiff has failed to produce evidence that the handbook referenced in her complaint is a contract. Further, she has not identified or produced to the court the alleged contractual provision that she claims the defendant breached. As to the claim that she was denied a transfer because she filed a complaint of misconduct, the evidence before the court shows that the plaintiff was in fact awarded the transfer to the position of Intelligence Officer. However, Chief Johnson testified that the plaintiff's filing of a criminal complaint with regard to the threatening telephone calls did impede the transfer and slowed the decision-making process. According to Chief Johnson, once the plaintiff satisfied his concerns regarding her trustworthiness, given that she had disregarded his instructions to delay filing a criminal complaint until after the internal investigation was completed, she was given the position (Johnson aff. ¶ 13). The plaintiff has failed to identify any contractual provision requiring the City to approve her requested transfers without any deliberation as to her ability to satisfy the requirements of the job. As for any allegation that the defendant City breached any anti-discrimination provision in the handbook, the plaintiff has absolutely failed to show that the City discriminated against her on the basis of her gender or any other protected category.

***Breach of Contract Accompanied by a Fraudulent Act***

In this cause of action, the plaintiff alleges the defendant City of Greenville's breach of contract was accompanied by fraudulent acts in that "false allegations [were made] against the plaintiff in an attempt to justify its actions against the plaintiff" (comp. ¶ 35). In order to recover for breach of contract accompanied by a fraudulent act, the plaintiff must be able to show: "(1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Conner v. City of Forest Acres*, 560 S.E.2d 606, 612 (S.C. 2002) (citing *Harper v. Ethridge*, 348 S.E.2d 374 (S.C. Ct. App. 1986)). In her response to the motion for summary judgment, the plaintiff stated, "[T]he employer's stated reason for the plaintiff's denial of position is false and fraudulent. Therefore, the breach of contract is accompanied by fraud" (pl. resp. m.s.j. 7). The plaintiff does not specify which position she was denied, nor does she present any evidence to support her contention that the City's stated reason for denial of a position was false and fraudulent. Based upon the foregoing, the plaintiff has not shown issues of material fact as to any of the three elements of the claim and, therefore, summary judgment is appropriate.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the motion for summary judgment be granted.

s/William M. Catoe
United States Magistrate Judge

November 14, 2006

Greenville, South Carolina